LORD BALTIMORE PRESS, INC., ET, MATTER OF, IN RE.

Common Pleas Court, Franklin County.

No. 217884.   Decided January 22, 1964.

*Frost & Jacobs, Mr. C. A. Atwood,* for appellant.
*Mr. William Saxbe,* attorney general, and *Mr. Frederic E. Whitker,* assistant attorney general, for appellee.

SATER, J. This is an appeal from the ruling of Willard P. Dudley, Administrator of the Bureau of Unemployment Compensation, holding that the Lord Baltimore Press, Inc., was not a successor in interest on January 2, 1962, by reason of its purchase of the non-physical assets of the Richardson Taylor Globe Corporation, and consequently was held by the Bureau as of April 4, 1962, to a contribution rate of 3.2 percent instead of the successor rate of about 1.0 percent. The facts in this case are not in dispute, only the accent on them and the application of the law to them. The controlling facts, some reported in and others elided from the Administrator's decision, follow.

The Lord Baltimore Press, Inc. (called Lord Baltimore herein), is a wholly owned subsidiary of The International Paper Company (called International herein). Brown and Bailey Company was a subsidiary branch owned and operated by The Richardson Taylor-Globe Corporation (called R. T. G. herein). The plant of Brown and Bailey Company was in Baltimore, Maryland; that of R. T. G. in Cincinnati, Ohio. While the negotiations described later herein and their fruition were in progress, Lord Baltimore built a modern press and manufacturing plant also in Cincinnati, that would not only accommodate its business as conducted up to the times in question, but also the modernized but larger scaled method of any R. T. G. business that would or might come to it.

International was interested in R. T. G.'s line of commodities, method of produciton, management, customer list and outlets, good will, name, patents, trade marks, and plant personnel. In other words, International was interested in adding to its field of production, the business of a more specialized and highly skilled concern operating successfully in a small segment of its own larger and probably far more greatly diversified field of production. But for two reasons it was not concerned with R. T. G.'s physical plant: (1) R. T. G.'s plant was

old and areawise could not possibly be expanded, hemmed in as it was by railroads on one side, zoning restrictions and unwilling sellers on other; (2) R. T. G.'s machinery was, some of it, old and all of it used, while Lord Baltimore had in the same city a much larger plant with new and, in some respects, more modern machinery to do exactly the same production work as that being done by R. T. G. For exactly comparable reasons, seeing the handwriting of physical plant limitation on the wall, R. T. G. was in the mood to sell if the price was right. International had the price but that price did not include R. T. G.'s accounts receivable or uncompleted production contracts. These matters were no stumbling block, (1) because R. T. G.'s receivables were of no use at all to R. T. G.'s actual business in the hands of International, though they would be, when collected, of value to R. T. G.'s stockholders, and (2) because no one, R. T. G., International or customers, would benefit by the delay necessarily incidental to moving R. T. G.'s operation, personnel and inventory of prefabricated stock that could be used on no other contracts to a new plant and a new site; in other words, these two elements were factors for the table at which International and R. T. G. bargained over the price R. T. G. wanted, and International would pay, for the day by day future business operation of successful but beset R. T. G.

By proper action early in January, 1961, International resolved to purchase the good will and business of R. T. G. and its branch subsidiary, Brown and Bailey Company, for not to exceed $2,600,000.00 contingent upon the obtaining of employment agreements with the principal executive and sales employees of the two latter companies. This resolution specifically excluded those latter companies' plants, equipment, inventories, other physical assets, cash and accounts receivable. Appellee relied on the wording of this resolution to the almost total exclusion of all else; but note well that not a single one of these excluded items separately or severally was either necessary or significant to International making R. T. G. and its business a part of International's business, though their retention by R. T. G. could be and was a liquidation bonus to R. T. G. In *Union-May-Stern Co. v. Indus. Com'n.,* Mo. App., ,

273 S. W. (2d), 766, wherein the part bargained away was valued at about one-fourth of that which was kept (the reverse of the situation now before us), the court held that the part kept was "not an essential part of the business and would not have been of particular value to the purchaser in the continuation of the business," and that the buyer was entitled to the seller's rate by succession. And in *Morrison* v. *Adm'r.*, 103 Ohio App., 263, wherein there was also succession to the rate, we are admonished to consider the substance rather than the form. So it must be on the facts before us in this case. It is a gross abuse of administrative discretion to measure every business transfer on the Procrustean bed of Section 4141.24, Revised Code, in disregard of the business world and of the facts of each case to the both of which that statute applies.

The negotiations were successful. In March, 1961, International and R. T. G. entered into a lengthy contract of sale of certain of the non-physical assets of R. T. G. and Brown and Bailey Company to International; it is before us on Exhibit 2. The material parts of that contract, for the purposes of this case, are (1) R. T. G. has taken, or before closing date of the contract will take, all proper and legal action to execute the sale; (2) all patents, patent applications, trademarks, trademark registration and trade names are free and clear in the sellers' names (and are included in the transfer); (3) R. T. G. agreed to sell

"(a) RTG agrees to convey, sell, assign and transfer, or cause B&B to convey, sell, assign and transfer, to International, and International agrees to purchase and acquire from RTG or B&B, as the case may be, on the Closing Date, as hereinafter defined, *all the assets* owned by B&B or RTG, or in which either has a conveyable or assignable interest, as of the Closing Date, except the following items: cash and moneys on deposit; the capital stock and debentures, if any of B&B; accounts receivable; deferred assets; insurance policies; claims, including claims for tax refunds; the B&B Plant and the RTG Plant, as hereinafter defined; inventories of raw materials and supplies, work in process and completed paper products and paper board products at the RTG Plant and the B&B Plant; and any other physical assets. The assets to be sold to Inter-

national pursuant to the terms of this paragraph shall include, without limitation, all unprocessed and unfilled orders or contracts which RTG or B&B shall then hold for the sale of products manufactured by RTG or B&B, the employment contracts referred to in Section 5 hereof, the good will of the business presently carried on by RTG and B&B or carried on by RTG and B&B at the time of the Closing Date, the right to the use of RTG's and B&B's corporate names and the names 'Richardson Taylor-Globe' and 'Brown & Bailey,' RTG's and B&B's patents, patent applications, trademarks, trademark registrations, and trade names described in Schedule B hereto, and RTG's contract rights under the contracts and license agreements listed or described in Part I of Schedule A hereto.''

(4) the purchase price $2,600,000.00 was agreed; (5) the closing date and the nature and description of the documents of transfer were agreed on; (6) International agreed, though it is not mentioned in the decision appealed from,

''4. International agrees that, on or prior to the Closing Date, it will have offered employment, at a plant to be constructed by International or a subsidiary of International in the Cincinnati area, to not less than seventy-five per-cent of the employees then employed by RTG at the RTG Plant, on terms which are, in the opinion of RTG, substantially as favorable to such employees as the terms of such employment by RTG, and further that, on or prior to the Closing Date, it will have made arrangements, satisfactory to RTG, for the granting to all employees of RTG (and all employees of RTG and B&B subject to the employment contracts referred to in Section 5 hereof) who shall become on or before the Closing Date employees of International, or any subsidiary thereof, of insurance and pension rights with respect to their employment by International or such subsidiary which are substantially as favorable to such employees as the insurance and pension rights which are presently enjoyed by such employees with respect to their employment by RTG or B&B, as the case may be. RTG agrees to cooperate with respect to the foregoing employment arrangements.''

(7) RTG agreed to use all best effort to effectuate this last quoted agreement, that is, R. T. G. agreed to exert its best

effort to cut its own business throat so that not a single one of its employees would stay with it or suffer any financial loss; (8) R. T. G. further agreed to help International obtain the best and fullest use of the names "Richardson Taylor—Globe Corporation" and "Brown and Bailey Company"; (9) R. T. G. agreed to operate its plant up to the closing date of this contract in such wise as to pass on to International its good will, unimpaired; (10) R. T. G. agreed to use its best efforts to keep and pass on to International its personnel organization; and (11) this agreement was to bind the two signatories, their respective representatives, successors and assigns. Schedules attached to the contract list R. T. G.'s contracts and leases, patents, trademarks and trade names of all sorts, office employees and employment contracts, all to go to International. Observe how greatly the terms of this contract vary from and enlarge upon the resolution of January, 1961.

For some strange, unexplained reason, appellee's opinion makes no reference of any sort whatsoever to this contract. And this despite the fact that the contract is a complete abdication of R. T. G. to International, a case, in fact, wherein R. T. G. actively participated in its own demise. Name gone, personnel gone, employees gone, inventory to become non-existent, trademarks, trade names and patents gone, good will gone, leases and future contracts and business gone; and all to one ready, willing and able to use them, and to carry on the RTG tradition as its own corporate subsidiary. What more could one ask? What more could a buyer seek? To ask these questions is to answer them. As witness Bond stated, Lord Baltimore took all, every part of R. T. G.'s business and customers; everything worth having to a going concern. Nor is it disputed that Lord Baltimore has taken over and is now doing R. T. G.'s business. This contract was business, industrial hari-kari to R. T. G., the death rattle in the throat of R. T. G.; and appellee should have recognized this and on the facts before us should have ruled accordingly.

Appellee's ruling was entranced by the book value of the R. T. G. physical property salable at around $600,000.00. But book value is all to often meaningless; and even more frequently it is as different from true or actual value as night and day.

He failed also to consider what its signature on the contract did to R. T. G. So let us see what this contract left to R. T. G. It left a plant antiquated, hemmed in and inadequate to even R. T. G.; salable by R. T. G. for peanuts maybe, to the first gamble-minded realtor, but of no earthly use to International, and of little to R. T. G. Used machinery that, absent the risk of costly maintenance and repair, falls in the same category. Receivables that could be collected from a letter drop or by counsel. And an unfinished contract that R. T. G. agreed to complete, more to preserve its transferred good will than for the resultant profit to R. T. G.; as the work of its employees ended on this contract they walked immediately into new quarters and the same work with the same or better machinery at International. At the same time Lord Baltimore had taken over R. T. G.'s pension, welfare and benefit plans, and was dealing with the same union that represented R. T. G.'s old employees.

R. T. G. was so completely emasculated that it changed its name to the Mitchell Avenue Company to complete this last contract and collect its receivables. R. T. G.'s business was unusual. Every contract it received to manufacture corrugated boxes carried its own unique specifications. Consequently, it purchased paper stock separately for each order, and as that order was filled, R. T. G.'s stock in trade diminished and was not replaced. It never had any general stock in trade. That is why R. T. G.'s stock in trade was of no earthly value to Lord Baltimore. That is why R. T. G. kept going only to fill its one big outstanding order. That is why, as their jobs ran out with it, R. T. G. released its employees to Lord Baltimore. That is why R. T. G. then resolved in the spring of 1962 to wind up and go out of business as had Brown and Bailey six months before. Where would R. T. G. have been after this sale? Nowhere. It would have had to start all over from scratch.

Appellee's opinion, quickly scanned, leaves the casual impression that when at last R. T. G. wound up, its employees at its plant numbered twenty. But if the eye is quick to grasp, the number was two, Mr. Thornberry and a janitor. In *Apex Smelting Co.* v. *Cornell,* 164 Ohio St., 369, the number on even an incredibly bad record was seven or eight. Further, in *Eiber*

*Realty Co.* v. *Dunifon*, 84 Ohio App., 532, neither buyer got more than a half of the seller's business; here it got all but an incompleted contract. The most important fact here before us is unreported and ignored by appellee: *Not a single officer or employee of R. T. G. lost a minute's work time by the R. T. G. transfer.* 95 per cent are still working. Of the remaining five percent, a few had transportation troubles and all the rest, having reached the proper age, retired, just as they would have done under R. T. G. *The most illogical fact, also unreported, is that while R. T. G. employees were being released to it in dribbles, Lord Baltimore paid the R. T. G. rate; now when it has them all, it must pay a higher rate.* What price logic!

Chapter 4141, Revised Code, is not concerned primarily with corporations; if it were, it would appear in the Corporation Law of Ohio. It is concerned with employees and their possible unemployment. But no compensable unemployment occurred here. As was said in *Mark Hotel Corp'n.* v. *Catherwood*, 194 N. Y. Supp. (2d), 580,

"The appellant Commissioner is not concerned with the transfer of the physical assets of the business but only in the unemployment aspects of the business. In that (the) report there was such continuity of employment here that it would seem in fairness to entitle respondent (here appellant) to the benefits of the employment experience of its predecessor in the operation of the business."

Execution of the contract, Exhibit 2, took time. The propriety of this is recognized in *In re: Stevens and Company, Inc.*, 125 N. Y. Supp. (2d), 615. International assigned its contract to Lord Baltimore. In the meantime, Brown and Bailey Company had to be wound up but this took a full year. R. T. G. worked to the completion of its one remaining contract (all others had been transferred) and as its needs for its employees and officers and office personnel ended, they stepped immediately at, at least, the same pay and with the same insurance and union recognition into the same jobs of R. T. G. Division of Lord Baltimore. Exhibit 3 shows that as a corporation R. T. G. wound up and so notified our Secretary of State.

Early in January, 1962, Lord Baltimore for its R. T. G.

Division filed its UCO-1 report with the Bureau. If it erred at all in doing so, it lay in its mistaken assumption that, through the rider to its report, the Bureau understood the underlying amalgamation as well as it did itself. Its March, 1962 Return held the same procedural flow. The impact of this flaw is shown in Exhibit 3 in which (par. 2) the Bureau says it awaits a confirmatory report from the defunct, wound up, dissolved R. T. G.; apparently one branch of our state government doesn't know what another branch has done. But certainly the record in this case should have cured that flaw for the appellee.

The law applicable to this case is found in the present amended form of the first two sentences of Section 4141.24 (F), Revised Code. (Appellee's decision alludes to its Regulation 306.7, but since that regulation is neither quoted nor offered in evidence as an exhibit or otherwise, we may not notice it judicially.) This statute was considered in December 3, 1963, by our own Court of Appeals (120 Ohio App., 145), *Automatic Plating Co. v. Leach, Adm'r.*, No. 7364; there was found to be succession there under circumstances far shakier to the successor than in the case now before us. We follow that case and hold that Lord Baltimore is successor to R. T. G.

In that statute, succession arises (1) if an employer transfers or otherwise reorganizes his business, (2) if an employer acquires substantially all of the assets in a trade or business of another employer, (3) if an employer acquires a clearly segreable and identifiable portion of another employer's enterprise. Note should be taken that succession arises in any one or more of three distinct ways. Neither party before us has rendered more than lip service to the first method listed above, though to us it is clearly applicable. We are, however, not necessarily required to rely solely on that method because the facts before us bring this case beyond question of doubt clearly within the ambit of the second method. An asset is something that has dollar worth to the one who wants it. Lord Baltimore left with R. T. G. nothing that it wanted, nothing of value, worth or use to R. T. G.'s business or to Lord Baltimore's absorption of it into itself. It took everything usable.

Both because it is against the manifest weight of the evidence and, separately or severally, because it is an abuse of

discretion measured in the light of the uncontroverted facts in the record, appellee's order is

Reversed and this case is remanded.